IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| *ex rel* RODERICK STRONG, | § | |
| Plaintiffs, | § | CIVIL ACTION NO.: 2:16-CV-284-JRG |
| | § | |
| vs. | § | |
| | § | (FILED UNDER SEAL) |
| WILEY COLLEGE and HAYWOOD | § | |
| L. STRICKLAND, RICE FINANCIAL | § | |
| PRODCUTS COMAPANY through its | § | |
| subsidiary, RICE CAPITAL ACCESS | § | JURY TRIAL DEMANDED |
| PROGRAM, LLC and THE WESLEY | § | |
| PEACHTREE GROUP, INC., | § | |
| Defendants | § | |

## **FALSE CLAIMS ACT AMENDED COMPLAINT**

TO THE HONORABLE COURT:

Plaintiff RODERICK STRONG (hereinafter, "Strong), on behalf of himself and as the *qui tam* plaintiff on behalf of the UNITED STATES OF AMERICA, files this action for damages against the above-named defendants for violation of the False Claims Act, 31 U.S.C. § 3729 *et. seq*., in connection with false and/or fraudulent claims and records or statements material to such claims submitted by them to obtain a $24.4 million loan under a program for Historically Black Colleges and Universities (HBCU). This program was administered by the United States Department of Education (DOE) and the loan was guaranteed by it.

### **JURISDICTION AND VENUE**

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345; and 31 U.S.C. § 3732.

2. Venue is proper in this district under 28 U.S.C. § 1391(b); and 31 U.S.C. §3732.

### **THE PARTIES**

#### A. Plaintiffs

3. Plaintiff, the United States of America, guaranteed a loan to the defendants Haywood L. Strickland and Wiley College through Rice Capital Access Program, LLC, as the legal

assignee of defendant Rice Financial Products Company ("Rice"), in its capacity as the Designated Bonding Authority ("DBA"), as a result of material false and/or fraudulent claims, records and statements submitted by the defendants Strickland and Wiley College.

4. Plaintiff and Relator Roderick Strong is a resident of Dallas County, Texas.  From May 2011 through June 2015 he was employed by defendant Wiley College as its principal financial analyst.  He was responsible for compliance and administrative matters related to Wiley College's HBCU loan, as well as other compliance, accounting, and financial matters. On June 2, 2015, he was discharged by defendants Haywood L. Strickland and Wiley College after a series of efforts by him to stop violations by the Defendants of the False Claims Act, the terms of the HBCU loan, and other federal regulations.

## B. Defendants

5. Defendant, Wiley College, is located at 711 Wiley Avenue, Marshall, Harrison County, Texas, on an approximately 70 - acre campus.  It was founded in 1873 by the Methodist Episcopal Church's Bishop Isaac Wiley.  It is notable as one of the oldest predominately Black colleges west of the Mississippi River.  In 1933, it was recognized as an "A" class college by the Association of Colleges and Secondary Schools of the southern states, marking the first time any Black school had ever been rated by the same agency and standards as other universities.  In 1944, it joined the United Negro College Fund as a charter member. In 2007, the school's 1935 championship debate team was the subject of a major motion picture, "The Great Debaters," starring Denzel Washington. Notable alumni include James L. Farmer, Jr. (civil rights leader), Bill Spiller (African-American golfer who challenged the segregationist policies of the PGA), Heman Marion Sweatt (plaintiff in *Sweatt v. Painter* (Supreme Court 1950), and Mike Lewis (an NFL player).

6. Defendant, Haywood L. Strickland (Strickland) is the President and CEO of Defendant Wiley College. He was elected its president on September 12, 2000. The immediate governance of Wiley College is delegated by the by-laws to him.  He resides in The President's Home on the campus of Wiley College, 711 Wiley Avenue, Marshall, Harrison County, Texas.

7. Defendant, Rice Financial Product Company through its subsidiary Rice Capital Access Program, LLC is 55 Broad Street, 27th Floor New York, New York 10004, was named the DBA for the DOE in April 2009 and continues to serve in that capacity.

8. Defendant, The Wesley Peachtree Group, Inc., ("Wesley") whose principal place of business is 1475 Klondike Road SW STE. 100, Conyers, GA 30094, served as Wiley College's independent auditors during the time the complained of actions took place.

## THE HBCU LOAN PROGRAM

9. The HBCU Loan Program was enacted in 1994 to recognize the prominent role of Historically Black Colleges and Universities in American history. Its Capital Financing Program addresses the HBCU's widespread need for capital improvements and general lack of access to traditional funding sources.
   The HBCU Loan Program is authorized pursuant to 20 U.S.C. § 1066 *et. seq*.
   The DBA acts as the DOE's agent. The DBA and the DOE work with a HBCU to determine if the institution has the necessary creditworthiness to qualify for a loan.

10. The established loan criteria include, but is not limited to, the college or university's accreditation standing, Title IV eligibility, cohort default rates, enrollment, debt ratio, debt service coverage, and capital improvement plans. If the institution qualifies financially, the DBA issues bonds for capital projects such as student housing, dining, and instructional facilities, and many other projects.

11. Rice, as the DBA for the HBCU Loan Program, is the issuer. All principal and interest is guaranteed to be repaid by the DOE, and the sole investor is the United States Treasury which purchases the bonds underwriting the financing. The loan interest rate is typically a small spread over the corresponding Treasury security yield and is tailored to the project's anticipated life.

12. If the college or university is unable to make its payments, the college will default. The escrow account and escrow accounts of other borrowers will be used to make the defaulted school's loan payments. The HBCU Loan Program will seek to liquidate the defaulted school's collateral and restore the other schools' escrow accounts.

## WILEY COLLEGE APPLIES AND OBTAINS AN HBCU LOAN

13. On October 26, 2010, Wiley College submitted to Rice a preliminary application [1] for a $24.4 million fixed rate 30-year HBCU loan to finance the following:

    a) construction and equipping of a living learning center which includes a 500-bed suite-designed student housing facility ($14.5 million);
    b) renovation of existing campus facilities including the Fred T. Long Student Union Cafeteria ($3.3 million), Jackson Hall ($100,000);
    c) resurfacing of parking lots ($175,000);
    d) refund of the $3.4 million Wiley College Endowment Fund Loans; [2]

---

[1] A Preliminary Application was submitted by an unauthorized employee of Wiley College inconsistent with the Federal regulatory requirements.

[2] Wiley College had borrowed $5.3 million because the Texas Attorney General had found the college was out of compliance with Texas law for spending its endowment.

e) refund two outstanding Board of Trustees notes: the Batten Loan - $159,618 of the original amount of $250,000, and the Scott Loan - $515,206 of the original amount of $750,000;[3]

f) payment of the loan escrow fund deposits and transaction costs.

14. On March 6, 2011, Rice issued a Decisional Memorandum concluding that Wiley College met all the credit requirements pursuant to the August 19, 2009, Agreement to Insure between Rice and DOE. According to the Decisional Memorandum, this conclusion was based on an analysis performed by Rice and on information provided by Wiley College, including its most recent audited financial statements for fiscal years 2006 – 2010, and the operating budget for the then current 2010 – 2011 academic year. The Decisional Memorandum provided information submitted by Wiley College and Wiley officials regarding its strong trend of enrollment growth, strong housing occupancy and demand, improved capital fund raising, and four consecutive years of positive year-end net operating income and four consecutive years of year-end net asset growth.[4]

15. The loan term sheet executed by Rice and Wiley College by President Strickland provided for a closing date of April 6, 2011, and identified the security for the loan: a) a security interest in the net revenues as defined in the loan agreement; and b) a first mortgage lien on certain campus properties. The value of this security was supposed to provide aggregate replacement value at least equal to the loan amount.

16. The campus property to serve as security for the HBCU loan was identified and valued as follows: Dogan Hall, $3,628,308; J. Jack Ingram Residence Hall, $4,520,551; Jackson Hall, $3,880,416; Johnson Moon Hall, $2,246,765; Fred T. Long Student Union and Cafeteria, $5,564,373; and Living Learning Center (March 2012), $14,500,000, for a total of $34,340,413.

17. Rice and Strickland on behalf of Wiley College, executed the April 6, 2011 Capital Project Loan Agreement and the April 6, 2011 Deed of Trust and Security Agreement.

18. Some of the HBCU loan proceeds were immediately received by Wiley College for certain of the loan's purposes; other proceeds were received over a period of time through a requisition process as the construction and renovation proceeded. The loan proceeds were deposited into one or more of Wiley College's operating accounts. Some 1,800 to 2,500 general ledger and business accounts are maintained by Wiley College. Strickland had the sole authority to sign all of the College's checks, to sign off on each and every expenditure, and to authorize wire transfers of college funds. When he was out of town, no college business could get done.

---

[3] The trustees were to be paid back money they had loaned the college to help cover its endowment shortage.

[4] Decisional Memorandum, pages 1-2

**DEFENDANTS STRICKLAND AND WILEY COLLEGE MADE FALSE
CLAIMS AND STATEMENTS TO OBTAIN LOAN APPROVAL AND THE
LOAN FUNDS**

19. Prior to and continuing after Wiley College's preliminary application  for the HBCU
    loan, Strickland has operated Wiley College as a personal cash cow through a variety of
    means including: setting up and operating an enormous number of accounts which
    convolutes the accounting process; being the sole authority to approve expenditures,
    make payments, and sign all of the College's checks; terminating the auditors who called
    attention to accounting irregularities; giving inflated valuations of donations for tax
    purposes many of which had to be subsequently written off presumably in return for
    payment;  insisting that the Wiley College Business Office not report any additional
    income outside his salary; reporting no taxes due to the IRS on the monthly cash
    payments to himself in addition to his salary and numerous transfers he made of Wiley
    College's money into his brokerage accounts, including presumably federal financial aid
    and Title III funds; and diverting and spending grant and pledge donations.

20. Wiley College and Strickland made and submitted to Rice materially false claims,
    statements, and records in order to both obtain approval for the HBCU loan and,
    afterwards, to receive the loan proceeds for the various projects, which they intended
    Rice to rely on and which in fact were relied on by the Rice on behalf of DOE:

    A) Wiley College and Strickland highly inflated the value of the campus property which
       was to serve as required security for the HBCU loan, using the insured value rather
       than the appraised value.

    B) Wiley College and Strickland highly overstated Wiley College's "net revenues" which
       were to be pledged as security for the HBCU loan. This was done in part through the
       manipulation of unrestricted net assets and non-cash pledge revenues, and recording
       cash pledges with a high likelihood of never being realized. One example is for the
       fiscal year ending June 30, 2008, and as a prior period adjustment to the financial
       statements for the fiscal year ended June 30, 2009, Wiley College increased its
       unrestricted net assets by $1.4 million due the booking of trust assets in which it had
       been advised by the trustee, Capital One Bank, that it had no ownership interest.
       Further, these same assets were recorded on the books of Jarvis Christian College,
       Hawkins, Texas. Both Jarvis College and Wiley College are audited by the same firm
       Defendant, the Wesley Peachtree Group, LLC.

    C) Wiley College presented false pro forma projections for enrollment growth, income
       and expenses for the five years following the HBCU loan application date.  In point of
       fact, during 2011 – 2015, Wiley College consistently had problems paying bills on
       time, including its federal loan debt service payments, laying off employees, and twice
       going to a four - day work week due to lack of funds. Current 2016 enrollment had

declined to approximately 55 percent of that projected at the time of applying for its
Federal HBCU loan.

D) Wiley College and Strickland presented false and inflated data to substantiate the need
for the $14.5 million Living Learning Center, the 500 – bed housing facility. In
addition, contrary to § 2.1(A) of the Agreement to Insure between the DOE and Rice,
no Needs Survey concerning it was presented to Rice by Wiley College.

E) Section 4.5 of the Capital Project Loan Agreement, signed by Strickland on behalf of
Wiley College on April 6, 2011, states that it (Wiley College) has made diligent
inquiry and has obtained or will obtain all necessary permits, licenses, accreditations
ad zoning and other certifications or other necessary approvals to construct, complete,
and occupy the project or the student housing property. In fact, Wiley College did not
obtain any construction permits in connection with the project, thus it can be presumed
no diligent inquiry had been made as of the signing date.

21. Further, Wiley College and Strickland failed to comply with the HBCU loan agreement
in many respects, but nevertheless received the advances through the requisition process:

F) Wiley College and Strickland did not provide the required projections under the loan
agreement as to the final cost in connection with any of the 34 advances it received
under the HBCU loan, contrary to §3.2(a)(3)(B) of the Capital Project Loan
Agreement.

G) Prior to receiving an advance of HBCU loan funds, Wiley College and Strickland did
not provide the required certificate stating that all materialmen, mechanics, and
suppliers have been paid in full or have waived or released all liens for services and
material rendered or delivered to date, contrary to §3.2(a)(3)(C) of the Capital Project
Loan Agreement. In fact, the general contractor and numerous subcontractors had
placed liens on the Living Learning Center project, but Wiley College and Strickland
continued to request and receive additional advances

H) Prior to receiving an advance of HBCU loan funds, Wiley College and Strickland did
not provide and did not obtain construction permits related to any of the projects
financed by the HBCU loan, contrary to §3.2(a)(6) of the Capital Project Loan
Agreement.

I) Prior to receiving an advance of HBCU loan funds, Wiley College and Strickland did
not obtain legally binding commitments in an amount equal to the excess cost of a
facility to be financed by the HBCU loan as required by §3.2(b)(2)(E) of the Capital
Project Loan Agreement. Wiley College and Strickland completed the Living Learning
Center and in so doing exceeded its budget by approximately $1 million. It then started
construction on the Fred Long Student Union/Cafeteria without legally binding

commitments for the excess funds and had to stop work because of a significant funding shortfall.

J) For the fiscal year ending June 2014, Wiley College and Strickland failed to comply with the informational reporting requirements pursuant to §§5.1(a)-(f) of the Capital Project Loan Agreement.

K) On occasion, the HBCU loan proceeds were used for non-loan purposes contrary to §§ 2.13 and 5.8 of the Capital Project Loan Agreement. One such misuse resulted in liens being placed on the Living Learning Center when the contractor and sub-contractors were not paid. Another misuse resulted in Wiley College's endowment account having less than $150,000 balance as of June 2015, since the $3.4 million HBCU loan proceeds for replenishment of the endowment account were transferred to an operating account and spent.

L) Wiley College has made numerous borrowings from trustees, a foundation, and an employee in 2014 and 2015 because it did not have the funds to operate, without obtaining the prior written consent of the Rice and DOE in violation of §6.1 of the Capital Project Loan Agreement. Moreover, Wiley College entered into a capital lease agreement for $215,000 with First American Leasing without obtaining the prior written consent of Rice and DOE in violation of §6.1 of the Capital Project Loan Agreement.

M) Wiley College has failed to make timely HBCU loan payments, some more than 30 days late, a violation of § 2.12 of the Capital Project Loan Agreement.

N) Wiley College consistently failed to make timely Loan Deposits, a violation of § 2.12 of the Capital Project Loan Agreement.

O) Wiley College abandoned the Fred T. Long Student Union Cafeteria Project in 2014 and never notified the RICE or DOE, a violation of §7.1(h) of the Capital Project Loan Agreement. It will take at least $2.5 million to complete.

P) Wiley College received a $750,000 insurance settlement to repair the J. Jack Ingram Residence Hall (part of the campus property that served as security for the HBCU loan) which was severely damaged by a flood in the Spring of 2015; however, Strickland spent the money but did not make any repairs, in violation of § 7.1(j) of the Capital Project Loan Agreement.

Q) Wiley College failed to meet its debt service coverage ratio, as well as its financial responsibility score required by DOE for the fiscal year ending June 30, 2014. This was not reported to Rice, contrary to §5.15 of the Capital Project Loan Agreement. It is now known what, if anything was reported to DOE. Also, for the fiscal year ended June 30, 2015, it appears that Wiley College manipulated data in order to bring it

within the required debt coverage ratio by (1) recording the $750,000 in insurance proceeds as revenue instead of a liability for the required repairs and (2) arbitrarily lowered the book value of the J. Jack Ingram Residence Hall and as a result, created an investment of $200,000 and revenues for fiscal year 2015 in the same amount. In addition to bringing Wiley College's debt service coverage ratio into compliance, these manipulations also enabled Wiley College to come into compliance with the DOE's financial responsibility score for receiving federal financial aid.

## DEFENDANT RICE AIDED AND ABETTED DEFENDANTS' STRICKLAND AND WILEY COLLEGE IN THE SUBMITTAL OF FALSE CLAIMS TO THE GOVERNMENT

22. Rice neither performed certain duties, including that of due diligence as prescribed in Appendix A by the Agreement to Insure between DOE and Wiley College, nor required Wiley College to provide key documentation, as require by the Agreement to Insure. The omissions and documentation include:

   A. Rice did not require Wiley College to provide the completed Needs Survey required pursuant to Section 2.1 of the Agreement to Insure.
   B. Rice did not require Wiley College to submit an actual loan application signed by an authorized officer of the College pursuant to Section 2.3 of the Agreement to Insure.
   C. Rice failed to provide evidence in the loan transcripts of due diligence required by Section 2.1 of the Agreement to Insure
   D. Rice failed to require an original closing binder with fully executed documents pursuant to Section 2.6 of the Agreement to Insure.
   E. Rice failed in to ensure that Wiley College provided adequate security for its loan as required pursuant to Section 2.9 of the Agreement to Insure; appraisals of collateral were not obtained; instead, Rice allowed insurance replacement values of the collateral properties to be used.
   F. Rice used the totally unrealistic financial projections provided by Wiley College in Rice's Decisional Memorandum.
   G. Rice disregarded the Title IV eligibility standards on financial condition set forth in 34 CFR §668.145 in that Wiley College was substantially delinquent on repayment of loans it had obtained from Trustees Scott and Batten.
   H. Rice did not address decreases in Wiley College's endowment account in accordance with the criteria in Appendix A of the Agreement to Insure; a portion of the loan proceeds, $4.3 million, were to reimburse the endowment account, and another portion of the loan proceeds, $674,000.00, was to refinance trustee loans made by Wiley College for the endowment account but instead the funds were deposited in Wiley College's operating account and used at Strickland's discretion.
   I. As required by Title IV eligibility standards on financial condition set forth in 34 CFR §688.15, Rice did not disclose in its Decisional Memorandum the auditor's

    substantial doubt about Wiley College's ability to continue operating as a going concern for fiscal year ending June 30, 2006.

J. Rice was aware that on an adjustment for pledges due in one year, Wiley College failed to meet the 1:1 minimum current ratio set out in the Title IV standards for financial condition, 34 CFR §688.15, for the years reflected in the Decisional Memorandum prepared by Rice.

K. After the HBCU loan closed, Rice failed to monitor construction and reconstruction of the Capital Projects to insure the work conformed to approved plans, the project schedules, and the budgets, as stipulated in Section 2.8 of the Agreement to Insure.

## DEFENDANT WESLEY PEACHTREE GROUP, INC. AIDED AND ABETTED DEFENDANTS STRICLAND AND WILEY COLLEGE IN THE SUBMITTAL OF FALSE CLAIMS TO THE GOVERNEMENT

23. Wesley manipulated Wiley College's financial results in order to qualify Wiley College for receipt of the HBCU loan, as well as maintain its Title IV eligibility including but not limited to the following:

A. Allowing Wiley College to continue to record temporarily restricted pledges as unrestricted revenue thereby improving the results of operations in various years. This practice is inconsistent with FAS116.

B. Failing to disclose Wiley College's significant delinquency on loan repayments to Trustees Batten and Scott at the time of the HBCU loan financing.

C. Permitting the manipulation of pledge revenue in contravention of Title IV requirements.

D. Recording the same assets on the books of both Wiley College and Jarvis College.

E. Allowing Wiley College to record certain tracts of land at 100 percent ownership when in fact Wiley College held an undivided interest in those tracts of land.

F. Assisting and allowing Wiley College to reclassify, during audit, significant ineligible expenditures of Title III funds made throughout the year since those restricted grant funds had been used for other purposes, and to arbitrarily adjust upward time and effort reports for certain employees in order to shift more payroll cost burden to federal grants.

G. Recording, in fiscal year 2015, an insurance settlement of $750,000.00 on collateral property for the HBCU loan, as revenue in order to assist Wiley College in meeting its debt coverage requirements and its composite score. The collateral property was never repaired.

H. Preparing Wiley College's federal form 990, on which Wiley College falsely answered yes to the question of whether its endowment funds are in the possession of and administrated by unrelated organizations; in fact substantially all of its funds are not in the possession of an unrelated party and 100% of its endowment is administrated by Wiley College.

## DEFENDANTS STRICKLAND AND WILEY COLLEGE DISCHARGED RELATOR STRONG FOR MAKING EFFORTS TO STOP THEIR VIOLATIONS OF THE FALSE CLAIMS ACT AND TERMS OF THE HBCU LOAN

24. Throughout his four years at Wiley College, Strong wrote memos and spoke out against the Defendants', Wiley College and Strickland, non-compliance with the terms of its HBCU loan.[5] Strong prepared compliance filings pursuant to the terms of the HBCU loan that were ignored and never signed by either Strickland or the Vice President of Business and Finance as required. A letter to the College Provost and subsequent conversation resulted in no corrective action. Strong also noted to the Vice President for Business and Finance that the internal projected earnings for 2012 were drastically lower than those projected in its HBCU loan application documents. As a result, the projected net profit would be insufficient to cover debt service. Strong never received a response.

25. Further, Strong expressed his concerns to Rice, DOE's agent, about the failure of Defendants to comply with the terms of the HBCU loan, as well as the financial distress that resulted from the Strickland spending all of the endowment funds received from the HBCU loan. He also advised Rice specifically about the abandonment of the Fred T. Long Student Union project without prior approval from Rice, as well as the failure to make timely loan payments.

## CLAIMS FOR RELIEF PURSUANT TO 31 U.S.C. §3729 *ET.SEQ.*

26. Plaintiffs re-allege and incorporates all of the allegations contained in the preceding paragraphs.

27. Through the purposeful acts and omissions set forth above, Wiley College and Strickland, aided and abetted by Wesley, knowingly presented or caused to be presented to the DBA, Rice, DOE's agent, false or fraudulent claims for payment or approval, and knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, in violation of 31 U.S.C. § 3729. In knowingly wrongful or negligent reliance thereon, Rice aided and abetted Wiley College and Strickland by approving the HBCU loan, entered into the Capital Project Loan Agreement with the Wiley College and Strickland, and paid Wiley College and Strickland $24.4 million in DOE-guaranteed funds.

28. Moreover, besides fraudulently obtaining the HBCU loan and the proceeds, Strickland misappropriated substantial portions of the HBCU loan proceeds for his personal use.

---

[5] Strong also spoke out and wrote memos against the Defendants' non-compliance with certain IRS regulations, employee compensation and fringe benefits, and the overall poor financial decisions made by them. For example, Strong wrote a letter to the Director of Human Resources, advising that payments and wire transfers from Wiley College operating accounts to Strickland were taxable income to him and that income and payroll taxes should have been deducted. The official responded that Strickland had directed the payments not be reported to the IRS.

29. In addition, Relator Strong was discharged by the Defendants, Wiley College and Strickland for attempting to stop one or more violations by the Defendants of the False Claims Act.

## NOTICE TO THE UNITED STATES

30. As required by 31 U.S.C. § 3730(b)(2), a copy of this amended complaint and written disclosure of substantially all material evidence and information the Plaintiff/relator possesses will be served on the Government pursuant to Federal Rule of Civil Procedure 4(d)(4).

## JURY DEMAND

31. Plaintiffs request a jury trial.

## PRAYER

WHEREFORE, the Plaintiffs pray that this Honorable Court enter judgment against the Defendants directing:

A) The Defendants are liable to Plaintiff in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' actions, as well as a civil penalty against each Defendant for each violation of 31 U.S.C. §3729;

B) The Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. §3730(d), including reasonable expenses, attorneys' fees, and costs;

C) The Relator be reinstated with the same seniority status that he would have had but for the unlawful discharge, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the unlawful discharge, including litigation costs and reasonable attorneys' fees; and

D) The Defendants are liable for the costs of this action;

E) The Plaintiffs receive all such other relief as the Court deems just and proper.

Respectfully submitted,

RENEE HIGGINBOTHAM-BROOKS
Texas State Bar No. 03070800
5601 Bridge Street, Suite 300
Fort Worth, Texas 76112
Phone: 817-334-0106
brooks99@sbcglobal.net